Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

# UNITED STATES DISTRICT COURT
for the

_____ District of Connecticut

_____ Division

| | | |
|---|---|---|
| SUBVERSE, INC. | ) | Case No. _____ |
| | ) | *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | ) | |
| (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | ) | Jury Trial: *(check one)* ☐ Yes ☐ No |
| -v- | ) | |
| EMILY MOLLI and ROCCO CASTORO | ) | |
| *Defendant(s)* | ) | |
| (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | ) | |

## THE DEFENDANT'S ANSWER TO THE COMPLAINT

### I. The Parties Filing This Answer to the Complaint

Provide the information below for each defendant filing this answer or other response to the allegations in the plaintiff's complaint. Attach additional pages if needed.

| | | |
|---|---|---|
| Name | Emily Molli | Rocco Castoro |
| Street Address | 6174 Glen Oak St. | |
| City and County | Los Angeles, Los Angeles County | |
| State and Zip Code | California, 90068 | |
| Telephone Number | 847-909-0337 | 352-538-6846 |
| E-mail Address | EmilyMolliVideo@gmail.com | rcastoro2@gmail.com |

### II. The Answer and Defenses to the Complaint

#### A. Answering the Claims for Relief

On a separate page or pages, write a short and plain statement of the answer to the allegations in the complaint. Number the paragraphs. The answer should correspond to each paragraph in the complaint, with paragraph 1 of the answer corresponding to paragraph 1 of the complaint, etc. For each paragraph in the complaint, state whether: the defendant admits the allegations in that paragraph; denies the allegations; lacks sufficient knowledge to admit or deny the allegations; or admits certain allegations but denies, or lacks sufficient knowledge to admit or deny, the rest.

Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

### B. Presenting Defenses to the Claims for Relief

Write a short and plain statement identifying the defenses to the claims, using one or more of the following alternatives that apply.

1. The court does not have subject–matter jurisdiction over the claims because *(briefly explain why there is no federal–question jurisdiction or diversity–of–citizenship jurisdiction; see the complaint form for more information)*

2. The court does not have personal jurisdiction over the defendant because *(briefly explain)*

    Castoro and I are not residents of Connecticut. I spent fewer than four months working in Connecticut. We had no employment agreement specifying our engagement with the company would be governed by the laws of Connecticut while other employees did have that agreement.

3. The venue where the court is located is improper for this case because *(briefly explain)*

    The Company has not operated in Connecticut since CEO Pool relocated operations in Oct 2019, after 4 months. From Oct 2019 to May 2020, operations were relocated to Pennsylvania. From May 2020 to Jan 2021, the allegations' time period, operations were relocated to California

4. The defendant was served but the process–the form of the summons–was insufficient because *(briefly explain)*

5. The manner of serving the defendant with the summons and complaint was insufficient because *(briefly explain)*

6. The complaint fails to state a claim upon which relief can be granted because *(briefly explain why the facts alleged, even if true, are not enough to show the plaintiff's right to recover)*

    The amount requested from my co-defendant and I is the approximate amount of money that I helped raise the company in 2019. The 2020 budget presented to the CEO in late 2019 and amount spent on production and staff throughout 2020 fell far short of $1.2 million.

7. Another party *(name)* _____ needs to be joined (added) in the case. The reason is *(briefly explain why joining another party is required)*

Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

    a.      If the basis for subject–matter jurisdiction is diversity of citizenship, state the effect of adding the other party:

The other party is a citizen of the State of *(name)* _____.

Or is a citizen of *(foreign nation)* _____ . The amount of damages sought from this other party is *(specify the amount)* _____ .

    b.      If the claim by this other party is based on an alleged violation of a federal constitutional or statutory right, state the basis:

This action was brought two months after Castoro and I made whistleblower complaints with the SEC regarding fraud and self-dealing. An exhibit submitted with Pool's affidavit directly references my belief Pool may attempt to interfere with an SEC investigation.

**C.    Asserting Affirmative Defenses to the Claims for Relief**

Identify an affirmative defense or avoidance that provides a basis for the defendant to avoid liability for one or more of the plaintiff's claims even if the basis for the claim is met. Any affirmative defense or avoidance must be identified in the answer. Include any of the following that apply, as well as any others that may apply.

The plaintiff's claim for *(specify the claim)*

is barred by *(identify one or more of the following that apply)*:

1.     Accord and satisfaction *(briefly explain)*

2.     Arbitration and award *(briefly explain)*

3.     Assumption of risk *(briefly explain)*

4.     Contributory or comparative negligence of the plaintiff *(briefly explain)*

5.     Duress *(briefly explain)*

Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

6. Estoppel *(briefly explain)*

7. Failure of consideration *(briefly explain)*

8. Fraud *(briefly explain)*

9. Illegality *(briefly explain)*

10. Injury by fellow employee *(briefly explain)*

11. Laches (Delay) *(briefly explain)*

12. License *(briefly explain)*

13. Payment *(briefly explain)*

14. Release *(briefly explain)*

15. Res judicata *(briefly explain)*

Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

16. Statute of frauds *(briefly explain)*

17. Statute of limitations *(briefly explain)*

18. Waiver *(briefly explain)*

19. Other *(briefly explain)*

**D.  Asserting Claims Against the Plaintiff (Counterclaim) or Against Another Defendant (Cross–Claim)**

For either a counterclaim against the plaintiff or a cross–claim against another defendant, state briefly the facts showing why the defendant asserting the counterclaim or cross–claim is entitled to the damages or other relief sought. Do not make legal arguments. State how each opposing party was involved and what each did that caused the defendant harm or violated the defendant's rights, including the dates and places of that involvement or conduct. If more than one counterclaim or cross–claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

1. The defendant has the following claim against the plaintiff *(specify the claim and explain it; include a further statement of jurisdiction, if needed)*:
   In 2019, Pool & Ottman misled investors & officers about employment terms and the company's projections & operations. Pool allowed Ottman to charge inflated "rent" rates to an entity they both had stakes in. They did this without a contract in place & penalized my protests against it. Through 2020-21 Pool misled me & Castoro about management roles & the state of the board.

2. The defendant has the following claim against one or more of the other defendants *(specify the claim and explain it; include a further statement of jurisdiction, if needed)*:

3. State briefly and precisely what damages or other relief the party asserting a counterclaim or cross–claim asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons that are alleged to entitle the party to actual or punitive money damages.

Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

a. The defendant asserting the counterclaim or cross–claim against *(specify who the claim is against)* Plaintiff alleges that the following injury or damages resulted *(specify)*:
Plaintiff's management has prevented me and Castoro from collecting unemployment insurance payments, causing rent, utilities, student loan, and credit payments to be missed. Plaintiff's management caused damage to our professional relationships through non-payment of vendors and false accusations of professional misconduct.

b. The defendant seeks the following damages or other relief *(specify)*:
Reimbursement with interest on company expenses incurred after Jan 6, 2021. Outstanding contractor payments paid with interest. Plaintiff ceases use of SCNR brand and other intellectual property developed by Castoro that were subject to terms of an agreement for equity that were unmet by Plaintiff. Back-pay from Jan 7, 2021 to present

## III. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this answer: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the answer otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 07/05/2021

Signature of Defendant *E. Molli*

Printed Name of Defendant  Emily Molli  Rocco Castoro

### B. For Attorneys

Date of signing:

Signature of Attorney
Printed Name of Attorney
Bar Number
Name of Law Firm
Street Address
State and Zip Code

Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

Telephone Number

E-mail Address

21-cv-000555																																																																			Molli & Castoro

## II. A. Answering the Claims for Relief

Your Honor,

Co-defendant Rocco Castoro and I believe Plaintiff fails to state a claim for which relief can be granted. The first four paragraphs of this Answer broadly address Paragraphs 24-32 of Plaintiff's Complaint, undermining in short order the thrust of Plaintiff's allegations as meritless and riddled with demonstrable falsehoods. This is followed by a granular, point-by-point rebuttal to Plaintiff's allegations that includes additional facts and context.

1. In the first count alleging fraud, Plaintiff Subverse, Inc. claims I unjustly enriched myself through the "fraudulent using [*sic*] Plaintiff's funds" for my own benefit. Castoro and I deny this allegation. In November 2019, Castoro submitted a budget for staff and production that he would manage if he joined full-time in 2020. In Jan. 2020 Pool enthusiastically and immediately approved Castoro's first pass at the company's annual budget, replying to Castoro that he would forward it to me. Pool's only follow-up question was whether crew meals and production craft services had been included in the budget, which I affirmed. Pool never added Castoro to the company bank accounts, despite multiple requests and subsequent promises to do so and Molli's communication to Pool that relying on a single company credit card for all expenses was untenable. Given our hectic schedules amid a grueling 2020 news cycle that sometimes had Castoro and I covering stories in locations across the country from one another while, in many cases, overseeing separate field crews.

2. Key to Plaintiff's allegation above is Paragraph 19, which claims that I "made unauthorized withdrawals and gave money or hired individuals, which directly contradicted the instructions [Molli] had been given by the Plaintiff's senior management." Castoro and I deny this allegation. Pool did not relay any such instructions — or any instructions whatsoever regarding the company's finances or content — despite the he had throughout 2020 to voice such concerns at multiple in-person meetings, on conference calls, or via email to Subverse, Inc.'s accounting firm with whom Pool never interacted or engaged. All the while, Pool maintained administrator access to Subverse Inc.'s payroll system and bank accounts. By default, Subverse Inc.'s online payroll system — Gusto — alerts administrators to every contractor's onboarding and each of their payments in real-time. Production and other job-related expenses were handled according in line with standards at professional media and production companies (Castoro was formerly the editor-in-chief of VICE Media), reimbursed after-the-fact so long as details receipts were provided and the expenditure production-related. All parties discussed and agreed to this familiar standard at

a February 2020 meeting attended by Castoro, Pool, Ottman, and I in New Jersey. As is standard, Subverse, Inc.'s payments to crew and other contractors were released according to the terms of their scope of work and corresponding invoice.

3. In Count Two Plaintiff alleges unjust enrichment, drawing from statements made in Paragraphs 1-26. Castoro and I deny this allegation. We maintain that neither of us have enriched ourselves through Subverse, Inc., before or after our unexpected termination. The equipment referenced, as addressed with New York attorney Wylie Stecklow in February 2020, is secure and has remained unused since early Jan. at the California address to which the majority of Subverse, Inc.'s equipment was shipped throughout 2020 — the address that served as the company's nerve center and de facto headquarters between May 2020 and January 2021 (largely do to COVID). Castoro and I remain on standby for more information regarding arrangements for its retrieval. As mentioned to Stecklow, neither Molli nor I have the funds to ship the equipment across the country, and we are under no obligation to do so. Furthermore, in a November 2020 Facebook Messenger exchange Pool details his extensive in-home studio setup while suggesting that production for a planned Subverse, Inc., daily news show could easily be staff and run out of Pool's Maryland home while Castoro and I continued our investigative projects and set meetings for HBO and Netflix re: a documentary series about the 2020 pandemic, in which Castoro, a California-based cinematographer, and I spent three months on the road in a small RV that we had fashioned into a mobile production unit, filming a country in disarray during the most deadly pandemic in a century. To our knowledge, Pool continues to maintain total control of Subverse, Inc.'s bank account, payroll system, and YouTube channel. For all intents and purposes, there is nothing preventing Pool from continuing Subverse's production and news gathering operations. Yet he has done nothing with the company since our termination.

4. Count Three alleges bad faith, claiming Castoro and I had engaged in "deceptive conduct out of self-interest, with the intent to mislead or deceive the Plaintiff into letting [us] steal the Company and its assets". Castoro and I deny this allegation. The claim that we intended to "steal" the company is baseless and contradicts one of Pool's main proclamations at a September 2020 board meeting, recorded with all parties consent at his New Jersey home — namely, that he would "give" us the company if investors didn't "expect" him to be involved. The March 2020 Subverse Inc. board meeting (the minutes of which Pool attached to the affidavit he submitted alongside the complaint) held by Castoro and was in accordance with company bylaws, was a direct response to Pool and Ottman's

previous falsifying of corporate documents and ignoring my protest of a special board meeting they had held without quorum, being that Ottman was removed from the board in April 2020 for self-dealing. As such, I requested that Ottman provide proof he was reinstated to the board or otherwise deemed to act as an authorized representative on behalf of the company. He ignored my requests. Contrary to Plaintiff's baseless allegation, the steps Castoro and I took following our correspondence with Wylie Stecklow were taken to prevent further harm to the company's operations arising from Pool's bad faith, unfair dealing, and gross misrepresentations of actions we have taken to to ensure the company does not suffer more harm at the hands of Pool as investors who feel they may have been misled by Pool reportedly explore legal options for restitution.

5. Paragraph 4 claims that on January 6, 2021, Castoro and I "began broadcasting information [we] knew to be private information from third party that [we] knew could be defamatory and or false." We deny this allegation. Castoro took care to redact personal information from materials I obtained as an authorized administrator for Chris and Tim Pool's MediaTemple account — forensics that show this suite includes dozens of what we and leading cybersecurity experts believe to be highly malicious domains jointly registered and administrated by Chris and Tim Pool. Plaintiff claims Pool and Ottman had told us to "cease these activities". At no time did Pool or Ottman tell us to cease doing any activities, nor is it clear what activities to which they may be making reference. Ottman called Castoro and I on January 7, 2021, and expressed dissatisfaction with Castoro's recent tweets. On the call Ottman explicitly mentioned one in which Castoro made reference to his belief that Overstock.com founder Patrick Byrne, who according to himself and news reports was sitting alongside the likes of Gen. Michael Flynn and disgraced lawyer Sidney Powell held late-night Dec. 2018 crisis meeting at the White House in which strategies like seizing voting machines were discussed as they ginned up desperate strategies to disrupt the certification of Joe Biden as the winner of the 2020 election — ultimately contributing to the chaos and ill-intent that enveloped that day in Capitol Hill.

6. Continuing Plaintiff's aforementioned misrepresentation of our activities on or around January 5 through January 7 is Plaintiff's assertion that Castoro and I "were discharged by the Plaintiff's senior management". Yet through present day, neither Castoro nor I have received any communication from, nor have any idea of the identities of, this so-called "senior management". Nor do we have knowledge of any employees or contractors having been hired by Subverse,

21-cv-000555                                                                    Molli & Castoro

Inc. since our dismissal. In fact, until Castoro and I served with the summons and Pool's accompanying affidavit, we had received no direct written or verbal indication whatsoever that we had been terminated — for or without cause. On January 7, the day Plaintiff claims to have terminated us, Castoro and I called Pool to address the above matters. He did not answer. January 7 is merely the last date staff received payment, not Plaintiff's opportunity to retroactively correct their potential violations of California labor law and subsequent acts of retaliation against Castoro and I. What's more, Plaintiff's recounting of our terminations fails to mention or acknowledge that our colleague and full-time Subverse, Inc., producer and reporter Rebecca Gibian was terminated simultaneously along with us — without warning, written or verbal notice, or cause. Gibian had no prior knowledge of Castoro's tweets and told us she hadn't even read them until after she realized she had been terminated, as the three of us discussed our options in the immediate aftermath of Jan. 6. Plaintiff has yet to inform Gibian of her termination or details thereof, verbally or in writing.

7. Plaintiff claims that "instead of returning the assets, which consists of professional camera equipment and editing equipment, and access to the website itself …" Subverse Inc.'s website, subverse.net, is inextricably tied to Ottman's social media website minds.com (essentially a social media platform with web-publishing capabilities). As such, any update to the Subverse minds.com account automatically updates the standalone subverse.net website. Both Pool and Ottman were granted administrator credentials to Subverse Inc.'s Minds.com account in 2019; therefore, they have since maintained access to publish content on subverse.net. As for the scnr.com domain, SCNR brand, and trademark, Castoro had negotiated clear parameters with Pool before his engagement with Subverse, Inc., first as a consultant and later a full-time employee. Many elements of the SCNR brand were developed by Castoro before his employment with Subverse Inc. and was subject to an agreement for equity that Plaintiff never met; one of the matters for consideration as part of this agreement was Castoro's rebranding of Subverse as an investigative news and documentary platform entity as the Subverse brand name had been involved in a preexisting trademark dispute with an adult video game named Subverse and wanted to move away from the original name.

8. Paragraph 4 continues, "… the Defendants sent a document purporting to be a Board Resolution appointing themselves as the new management of Subverse, Inc.", a gross misrepresentation and reduction of the proceedings that led us to call the special board meeting

21-cv-000555                                                                                                                                 Molli & Castoro

Castoro and I held. In April 2020, Ottman was removed from his positions as an officer and from the board in response to his self-dealing of company funds to his now-defunct company Minds Studios, LLC, in which Pool holds or held a 10 percent stake. Ottman's removal was conducted under advisement of corporate counsel and in accordance with the company bylaws (as well as Connecticut General Statutes Sec. 33-766, and Sec. 33-749 regarding removal of officers and action without a meeting). The document removing Ottman from his positions was signed by Pool and sent to Plaintiff's corporate counsel. The change in Ottman's positions is also reflected in the letter to investors accompanying the 2019 Annual Report, which was reviewed and signed by all principal parties. Castoro was added to the board by the board of directors, under advisement of corporate counsel, prior to Ottman's removal. In February 2021, Pool and Ottman called a special board meeting, which I protested on the grounds that Ottman was not a director, therefore the meeting had no quorum. I also stated that I believed the meeting would be used to obstruct an investigation by the SEC due to our complaints filed with the Office of the Whistleblower. Prior to the meeting, I lodged my formal protest to Pool, New York attorney Wylie Stecklow, and Subverse, Inc. corporate counsel Jeff Bekiares. I insisted that my protest be entered into the company record. Pool and Ottman held the meeting and ignored my protest, marking me on the record as abstaining. In response, I sent a notification of a special board meeting to Pool and Castoro in accordance with company bylaws. The proceedings of that meeting, detailed in the minutes, were done in the best interest of the company to prevent Pool's rogue actions and obstruction of investigations. My demands as a shareholder for inspection of corporate records went ignored.

9. Paragraph four claims that our "true intent" was "to highjack [*sic*] the Plaintiff Company and its' [*sic*] website for their own purposes." Castoro and I deny this allegation. In multiple conversations Castoro and I had with Pool throughout 2020, he stated plainly that he should not be CEO of Subverse, Inc. as his preoccupation with Timcast Media Group, Inc. hindered his ability to attend to the day-to-day duties of Subverse, Inc. This sentiment was repeated to others including Castoro, who Pool had personally approved to act on his behalf when rewriting Plaintiff's bylaws with corporate counsel in March 2020. Pool asked me in April 2020 if I trusted Castoro to be CEO, to which I responded that I did and that Castoro needed to be given "golden handcuffs" for the work he had been doing, and Pool agreed. In July 2020, Pool called SCNR a "burden" to him because of the legal cost of sending the new bylaws to his lawyers to look over. Pool never stated what specifically he took issue with and never connected us or

21-cv-000555                                                                                             Molli & Castoro

Plaintiff's corporate counsel with his lawyers despite multiple requests. He made the accusation then that we were trying to steal his companies but would not elaborate what led him to that belief.

10. Finally, Paragraph 4 concludes that only I had shares in the company and no other shareholders were allowed to vote on the resolution, but according to Subverse, Inc.'s bylaws, "any director may be removed for cause by action of the board of directors."

11. Paragraph 14 claims that I became one of Plaintiff's lead reporters "shortly after the founding of Subverse, Inc." despite the fact I was the only reporter for Subverse, Inc. before, during, and after its incorporation until I hired and trained staff in 2019. Pool first approached me to start Subverse in 2017, the same year he established a Subverse entity in New York State which he later abandoned due to a falling out with one of its principals over equity. Pool established another Subverse, Inc. entity in New Jersey in 2018, to which I was granted a 5 percent stake before he abandoned that as well, claiming that it didn't exist because he did not receive the paperwork. Records from the New Jersey Department of Revenue and Enterprise contradict its nonexistence.

12. Paragraph 14 also claims that "[r]ealizing that the content that Defendant Molli and others were creating needed editing, Subverse hired Defendant Castoro to become SCNR content editor." This is another misleading statement. Pool approached Castoro at the end of October 2019 for his services as the former Editor-in-Chief of VICE Media's global operations. During the initial discussions, Pool indicated to Castoro that he wanted Castoro to run Subverse and help demote or push me and Ottman out of Subverse. This lines up with communications from others who alerted me that Pool intended to remove and replace me. During Castoro's time as a consultant, he informed Pool he saw no issues with my work.

13. Paragraph 17 claims "Defendants were in Washington D.C. creating a documentary about former President Donald Trump's rally." I was in D.C. to film the "Stop the Steal" rally as part of a larger project about influence operations tied to Chinese national Guo Wengui, not knowing the rally would result in the attack on the Capitol. Plaintiff claims that "[d]uring the historic events at the United States Capitol, the Defendants began to disseminate private and inappropriate information which belonged to a third party." There was no information included in the tweet

posted by Castoro on January 5 that was private or otherwise "inappropriate". Twitter would have removed the posts if they contained such information. Plaintiff claims that "[e]ach was directly told to stop these activities by Subverse's largest shareholder and CEO, Tim Pool", but at no point did Pool tell me or Castoro to "stop" posting the information. The only demand Pool made was for me to leave the Capitol and go to his residence over an hour away "as soon as possible", which I felt to be highly inappropriate due to the coercive and intimidating manner in which he was communicating with me.

14. Paragraph 18 claims that "[I]nstead of addressing the concerns raised by Tim Pool, the Defendants ignored good faith communication and began acting as if Subverse, Inc. and its website, SCNR.com were their own." Castoro and I deny this allegation. Castoro and I attempted to contact Pool on January 7, which went unanswered. On January 8 I urged Pool to schedule a time for another call, which he did before quickly reversing course and canceling. He said at this point such a call was moot, and that I should have called him the day prior. I answered that Castoro and I had tried to call but that the did not pick up. Pool accused me of ignoring him, though our messages on January 6 clearly show I promptly responded to his initial texts earlier in the day — and again when I finished securing and logging footage, just a few hours before my return flight home to Los Angeles early January 7.

15. Paragraph 18 also claims we "took all the Plaintiff's professional video, computers and editing equipment to their new home in California, and to date have refused to return the equipment." Castoro and I deny this allegation. The vast majority of the equipment in question was originally shipped to Castoro's home office in Los Angeles, where he has lived since 2015 and which served as the Company's nerve center when I relocated there in May 2020 — largely due to COVID-related restraints that made it exceedingly difficult to lease reliable and safe office space. In mid-June, I cleared the rest of the equipment from my former Pennsylvania apartment, which up until my move to California had served as the company's office and studio space. I left some of this equipment and property at Pool's home in Woodbury, New Jersey, and took other equipment to Los Angeles where the majority of Subverse, Inc.'s staff and contractors live and work. As discussed with New York attorney Wylie Stecklow in our initial February 2020 phone call, Castoro and I have neither the financial means or obligation to ship this equipment across the country, and we shared concerns shipping it to the New Jersey address where Pool no longer resides (he move to Maryland in October 2020) at the direction of a New York attorney

21-cv-000555                                                                                     Molli & Castoro

who would not provide a signed declaration of representation or specify the names or professional roles of his alleged clients beyond his purported representation of Subverse, Inc.'s "ownership." We briefly discussed item retrieval, but he made no further attempts to arrange pick-up of the equipment and did not attempt to follow-up with us again on the matter. At no point did Castoro or I refuse to return the equipment. Nor did we conceal its whereabouts or impede any attempt to retrieve it. Ottman ignored my requests for proof that he was acting an authorized representative of the company and could make demands regarding company assets, given his past misuse of   Subverse, Inc. financial resources in odd maneuvers of self-dealing.

16. Paragraph 19 also claims that "[i]nstead of producing additional or new content, in the middle of 2020, the Defendants began to use the money that had been raised to launch Subverse as if it were their own." Castoro and I vehemently deny this allegation. A mere glance at Plaintiff's YouTube channel instantly disproves this statement. Castoro and I consistently produced content throughout 2020. Over the summer and into the fall Castoro, Gibian, and I produced *Revolution Retrospective*, a single-camera vérité documentary series that followed civil unrest across the country in the wake of the murder of George Floyd. Other content published during the time Plaintiff references include commissions from contractors, and the first two parts of our investigative series into self-proclaimed CCP dissident and alleged double agent Guo Wengui. Communications between Pool, Ottman, Castoro, and I also show that both knew full well Castoro, Gibian, and I had been producing two other documentary series to shop to streaming services through Castoro's manager. The obstacle to this was Pool delaying the completion of the new corporate bylaws which would give Castoro a path to equity and establish a subsidiary LLC beneath Plaintiff to silo news and production liability that would arise from these deals. These terms were agreed upon in our February 2021 meeting and again in March when email communications show Pool simply wanted to call Subverse, Inc.'s corporate counsel to authorize Castoro to handle these matters.

17. Plaintiff claims in Paragraph 19 that I "began to use the money as if it were [my] own", and that I "made unauthorized withdrawals and gave money or hired individuals, which directly contradicted the instructions she had been given by the Plaintiff's senior management." As previously stated, Castoro and I deny this allegation for the reasons stated in Paragraph 2 of this Answer. All receipts from these production purchases are accounted for, as they were to be submitted as budgeted line items to be recuperated in a series sale or advertising revenue.

21-cv-000555                                                                                          Molli & Castoro

18. In Paragraph 20, Plaintiff claims that because of the "unauthorized use of the Plaintiff's funds and the dissemination of private or defamatory information that did not belong to Defendants, the Plaintiff's CEO Timothy Pool terminated the Defendants employment on or about January 7, 2021." As previously stated, neither Castoro nor I received any direct communication from Pool on January 7 informing us of our termination. Plaintiff claims the information did not belong to us, despite the fact that I was an authorized administrator to the MediaTemple account from which I collected said information after discussing this matter at length with Pool to no avail.

19. In Paragraph 21, Plaintiff claims, access to the bank accounts was terminated on January 8, 2021, but that by then we "had made many unauthorized withdrawals for their own benefit." Castoro and I deny this allegation. Emails from Bank of America show my access to the bank account was removed on January 6. The only subsequent purchases that would have been made were services on auto-bill. Any accidental charges were reversed immediately. By removing my access to the bank account on January 6, Pool prevented my ability to cancel the company credit card in my name. By not cancelling the card in my name right away, I believe Pool may have been attempting to set me up for this allegation of unauthorized withdrawals of auto-billed services. Pool has continued to ignore my written request as a shareholder for corporate accounting.

20. Paragraph 22 claims that instead of "addressing the issues presented by Subverse, Inc. and its' management team, the Defendants have made overt efforts to take over the Plaintiff and its business through a series of bogus transactions." Stecklow stopped responding to our emails to try to get these matters addressed, and our relationship with Subverse, Inc. properly severed. Pool has not addressed these issues, and continues to elude them through disingenuous maneuvers such as those described above. Instead, he and his brother Chris Pool continue to push a false narrative that their MediaTemple account had been hacked, while making false and derogatory statements about Castoro and I. I believe Pool has demonstrated the same bad faith in these proceedings that he has long exhibited in his personal and professional life extensively documented in recent reporting from numerous mainstream press and academic outlets.